## No. 5499.

## JOHN MAINES *v.* THE STATE.

1. PERJURY—EVIDENCE.—The perjury assigned in this case was the false testimony of the accused upon the trial of one W., for cattle theft. Upon the trial of the accused for the perjury the trial court permitted certain State's witnesses to testify to conversations among themselves and one M., concerning the suspicion of M. that W. was a cattle thief; and further, to an agreement entered into between the said witnesses and M. developing a plan whereby M. was to detect W. in the theft of cattle; neither the defendant nor W. being present when the said conversations were had and the agreement entered into. *Held*, that the testimony, being hearsay, was clearly inadmissible; and the conversations and agreement, being *res inter alios acta*, were not binding upon either W. or this defendant.

2. SAME.—The State's witness M. was permitted to testify, on this trial, that after he had testified fully on the examining trial of W., for cattle theft, he fled the country because of serious threats uttered against him. *Held* that, in the absence of evidence showing that the threats were uttered by the defendant, or that he had some connection with them, the evidence was incompetent, and its admission was erroneous.

3. SAME—CHARGE OF THE COURT.—The record of proceedings on the trial of W. for theft was admissible against the defendant on his trial for perjury committed on the trial of W., but only as matter of inducement in committing the perjury, and not to prove the perjury; and, being admitted for that specific purpose, the charge of the trial court, omitting to restrict and 'imit it accordingly, though not excepted to, was erroneous. See the opinion for the rule stated *in extenso*.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for perjury alleged in the indictment to have been committed by the appellant as a witness upon the trial of one Joe Wyers, for cattle theft, on the thirteenth day of February, 1886. The substance of the alleged false testimony will appear in the statement of the case. A term of five years in the penitentiary was the penalty assessed against the appellant.

The State introduced Charles H. Bartlett, who testified that he was the clerk of the District Court of Falls county, Texas, on the thirteenth day of February, 1886, when one Joe Wyers was

tried in that court upon an indictment charging him with the theft of a steer, the property of one G. W. Lewis. He remembered distinctly that he personally administered the oath to the witnesses for Wyers in a body before they were placed under the rule. He could not positively recall the defendant as one of the body of witnesses to whom he so administered the oath, but remembered distinctly that defendant was placed upon the stand and testified as a witness for the defense upon the said trial of Joe Wyers. The witness then identified the book put in evidence as the minutes of the district court of Falls county, for the January term of said court, A. D. 1886, and, under the proper date, read the entire proceedings had upon the said trial of the said Wyers for cattle theft. The record, as read by the witness, was then put in evidence.

K. Sewell was the next witness for the State. He testified, in substance, that he served as a juror on the trial of Joe Wyers for cattle theft, in February, 1886, and distinctly remembered that the defendant appeared and testified as a witness for the defense on that trial. In substance the defendant testified on that occasion, that he and Joe Wyers, while cow hunting near the Hope church tank, in Falls county, met one W. T. Richardson, about half a mile from the said church, on the road to the house of John C. Criswell. The said Richardson told the said Wyers that, on that morning, and but a short while before meeting the said Wyers and defendant, he saw the dead body of a steer at a certain place which he described to the said Wyers. He, defendant, then testified that he and said Wyers went to the house of the said Wyers, got a late dinner, and then went to the place indicated by Richardson, found the dead body of a steer, skinned the same, took the hide to the place of the said Wyers, where Wyers hung it on the fence; that they found the body of the steer at the place indicated by Richardson, on the road leading from Hope Church to Criswell's house, about half a mile from the said church. Defendant described the dead animal as a red steer branded UO on one side and B on the other, and said that, from indications, he thought the said steer died of the "scours." The witness did not specially charge his mind with the testimony of the defendant on the said trial, and was now unable to swear that the defendant testified that the animal he and Wyers skinned was the same animal charged in the indictment against Wyers as stolen by Wyers. Defendant may have so testified, but, if he did, the witness could not now remember it. Witness

saw the clerk administer the oath to the witnesses in the Wyers case, but could not say that the defendant was or was not of the number sworn.

Charles Norwood testified, for the State, that he was deputy sheriff of Falls county, Texas, and served the district court of said county as bailiff at its February term, 1886. He was present in court when the case against Joe Wyers, for the theft of Lewis's steer, was tried. He saw the clerk administer the oath to the witnesses in a body, and knew as a matter of fact that the defendant stood among the crowd of witnesses to whom the said oath was administered. Witness was positive of this fact, because he remembered that defendant was the last of the witnesses, and, not being in the court room when the rule was invoked, and the witnesses ordered to confront the clerk, he was called by witness. Defendant came into the court room on being called, and, as required by the witness, removed a pair of extraordinarily large and noisy spurs from his feet, and took position with the other witnesses in front of the clerk. He was standing with the other witnesses when the oath was administered and retired with them under the rule, but witness could not say that he held up his right hand or that he manifested his assent to the oath as administered by the clerk. Defendant afterward took the stand as a witness for the defendant Wyers, and, in the hearing of the witness, testified, in substance, as stated by the witness Sewell.

Z. I. Harlan, testified, for the State, in substance, that he was a lawyer by profession, and represented Joe Wyers in his trial in February, 1886, for the theft of Lewis's steer. A short while before that case was called on the twelfth day of the said month, the witness, his client Wyers, and the defendant, who was the main and indispensable witness for the defense in that case, went together from the court house to the witness's office for the purpose of preparing an application for a continuance of the case. Court was called about the time that witness finished the application, and, as he left his office with Wyers to return to the court house, he told the defendant to "come on," that he was satisfied the continuance would be refused, and Wyers be compelled to go to trial. The case being called presently, the witness presented his application for a continuance, which was promptly refused. Witness then had the witnesses for the defense called, and was absolutely certain that the defendant took position with the other witnesses who confronted the clerk

when the oath was administered, but the witness was unable to say that he held up his right hand, or otherwise manifested assent to oath. He retired under the rule with the other witnesses and afterward testified for Wyers, substantially as stated by the witnesses Sewell and Norwood, and, in addition, that he, defendant, had long known the steer skinned by Wyers and himself; that the said steer had herded with the cattle of the said Joe Wyers and old lady Wyers, and that the said animal was in the brand of G. W. Lewis, the party alleged in the indictment against Wyers to be the owner. Defendant also testified to something about the animal skinned by him and Wyers being the same animal for the theft of which the said Wyers was then on trial, but witness could not now recall his statement.

John La Prelle, a juror on the trial of Wyers, testifying for the State, detailed the testimony of the defendant on that trial substantially as it was detailed by Harlan, and added that he distinctly heard the defendant swear on that trial that the animal skinned by him and Wyers was the property of G. W. Lewis, and was the identical animal for the theft of which Wyers was then being prosecuted, and that Wyers did not kill the said steer, but found it dead, and skinned it under the circumstances related by previous witnesses.

K. A. Reed was the next witness for the State. He testified, in substance, that, in September, 1885, George W. Morris, Jr., came to him and told him that Joe Wyers had proposed to employ him to assist him, Wyers, in the business of peddling beef, but that as he suspected Wyers of killing cattle that did not belong to him, he was unwilling to enter Wyers's service without consulting witness, McClanahan, and others who owned cattle. Upon seeing McClanahan and others, and effecting an understanding with them, the witness advised Morris to go to work for Wyers, under the agreement to make a critically correct note of the description of all animals killed by Wyers other than those he knew Wyers to own, and to report the same to witness, McClanahan and others. Morris became a party to this agreement, entered the service of Wyers, and the officers of Falls county were notified of the agreement described. In pursuance of this agreement, Morris reported four different animals butchered by him and Wyers during the month of October, 1885, the G. W. Lewis steer, the subject of Wyers's prosecution, on the thirte·nth day of February, 1886, being the last of the four re-

ported.   Between sundown and dark on the evening of October
28, 1885, witness went horseback to the house of Joe Wyers, to
see George Morris.   He found Wyers and Morris in the lot,
butchering the carcass of a beef.   The hide lay under the car-
cass, hair side down, and consequently witness could not see the
color of the same or the marks or brands.   Wyers insisted on
the witness taking a "mess" of meat home, and witness did so.
On the next morning Morris came to witness's house and re-
ported to witness that the steer butchered by him and Wyers on
the previous evening was the G. W. Lewis steer, for the theft of
which Wyers was afterward, on February 13, tried.   Morris
gave witness a complete description of the animals, including
marks and brands.   The witness and other gentlemen lodged
complaint against Wyers, and he was arrested on October 30,
1885, for theft of several cattle, including the Lewis steer.

On the day of, but after the arrest of Wyers, Deputy Sheriff
John T. Barlow summoned the witness to aid him execute a
warrant for the search of Wyers's premises.   That search dis-
covered on the back fence of Wyers's place the hide of a fat
two year old steer, red in color and branded UO on one side and
B on the other,—the brand given by G. W. Lewis of Limestone
county, who, on the trial of Wyers, was proved to own the ani-
mal from which the hide was taken.   A two year old steer cor-
responding in color, brand and mark to the said hide herded
with the witness's home cattle on the range, from the spring of
1885 until about two weeks before the said October 28, 1885, when
it disappeared and has not been seen since by the witness.   While
the witness could not swear absolutely that the hide of that steer
and the hide found on Joe Wyers's fence were one and the same,
he was morally certain of it.

George W. Morris, jr., was the next witness for the State.
He detailed the terms and agreement between himself, Reed,
McClanahan and others under which he entered the service of
Wyers, substantially as stated by the witness Reed.   The wit-
ness stated that he began work for Wyers on October 1, 1885,
and remained in his employ until the latter's arrest on October
30 of the same year.   During his term of service with Wyers,
he and Wyers killed and butchered four beeves belonging to
other parties, all of which were promptly reported by witness
to Messrs. Reed and McClanahan, in pursuance of the agree-
ment.   One of the four animals described was owned by Dock
Ainsworth, another by Whitaker & Nicholson, the third by the

widow Wyers and the fourth by G. W. Lewis, which last ani-
mal was the subject of the prosecution for theft against Wyers,
in which the perjury by defendant is alleged to have been com-
mitted. On the twenty-eighth day of October, 1885, the witness
and Wyers went to the range near the Hope church tank to get
a steer which Wyers claimed to have running in that neighbor-
hood. They found the Lewis steer. Wyers claimed that the
animal belonged to him, but said that somebody had changed
the mark and brand. They drove that steer to Wyers's house,
and killed and butchered it that evening. While engaged in
cutting up the carcass, Mr. R. A. Reed rode up, got down from
his horse, and came into the lot to see witness. The carcass was
then quartered up on the hide. Wyers gave Reed a mess of the
beef when he went home. Wyers killed that steer by knocking
it on the head with an ax. On the next morning the witness
went to Reed's house and told him that the steer butchered by
him and Wyers on the previous evening was the red UO and B
steer that had run with his, Reed's, cattle during the preceding
spring, summer and fall. Witness was with Wyers all day of
October 28, and saw nothing of the defendant, who was not then
in Wyers's employ.

On his cross examination, the witness said that, at the time
the four beeves mentioned by him were killed, he knew that
they did not belong to Wyers. A large number of cattle died
of the scours during the year 1885. Witness lived in Tyler
county during the year 1886. He knew that he was wanted in
Falls county during that year, but did not go to said county
until he was taken there under attachment. Defendant some-
times hunted cattle about the Hope church tank, but he knew
nothing whatever about the killing of the Lewis steer. On his
re-examination, the witness stated that, after he had testified
fully upon the examining trial of Wyers, he went to Tyler
county, because serious threats had been made against him.

John McClanahan testified substantially as did the witness
Reed, concerning the agreement with Morris, and the interviews
with Morris which resulted in the agreement. He knew of the
witness Morris having been threatened about the Wyers case.

R. A. Reed, recalled by the State, testified, in substance, that,
a day or two after the conviction of Joe Wyers, he and his
brother-in-law, John Gill, went to the place near the Hope
church where it was claimed that Joe Wyers and defendant had
skinned a beef. He found two piles of cattle bones, about one

hundred yards apart. The pile containing the complete skeleton was the remains of an eight or nine year old cow. The other pile, of which there were not more than half the bones, appeared to have lain there but a short time. But half the skull was found. Witness fitted the horns lying near to this half of skull, and, from the peculiar formation of head, he thought it the skull of the Lewis UO steer.

The State closed.

Dud Reed was the first witness for the defense. He testified, in substance, that he saw a red steer in Lewis's UO brand, near the Hope church tank, in the spring of 1885. He last saw that same steer on the range in 1886, after the trial and conviction of Joe Wyers.

Whit Criswell testified, in substance, that he had seen several of the Lewis UO cattle on the Hope church range. He saw a small red two year old steer on that range in the fall of 1885. The animal then appeared to have the scours, and that fact attracted the witness's particular attention. This was before the arrest of Wyers.

W. T. Richardson testified, for the defense, that some time in October, 1885, he met the defendant and Wyers in the road near the Hope church. They said they were hunting cattle for Rickelman, and asked if witness had seen any cattle. Witness told them where he had seen a dead steer. That dead steer was a red two year old, branded UO on one side.

On his cross examination, this witness said that an indictment for perjury in the Joe Wyers case was pending against him. The steer described by witness appeared to have been dead about twenty-four hours when witness saw it. Witness remembered being at Kirlew's store on Christmas eve day, 1885. He was very drunk at that time. He met Oliver Dougherty on that occasion, but had no recollection of saying to Dougherty: "If Joe Wyers wants a good, swift witness, I am the boy."

Jesse Brothers testified, for the defense, that he once observed a pale red two year old steer in the UO brand near the Hope church. Going home on the same day, and near the same place, he saw a deeper red two year old in the same brand. He thought, but was not certain, that one, and perhaps both of those steers, had another brand, but could not so testify. He had never seen either of those animals since.

Henry Coody testified, for the defense, in substance, that in the fall of 1885, he saw the dead body of a red "cow brute"

lying near the road a short distance from Hope church. Wit-
ness observed it only close enough to see that it was branded
UO.

On his cross examination the witness testified that he was not
in Falls county in February, 1886, and did not testify on the
trial of Joe Wyers. A few days after that trial witness made
an affidavit in support of Wyers's motion for a new trial. If he
stated in that affidavit that he found the dead animal in Octo-
ber, 1885, that, and not his statement on this trial that it was in
the summer, was correct, as the facts were then fresher in his
memory. A day or two after he first discovered the dead ani-
mal the witness passed back over the same route and again saw
it, but could not now say whether it was then skinned. If his
affidavit in support of Wyers's application for new trial states
that the body was then skinned, the affidavit was correct, as the
facts were then fresher in his memory.

Defense closed.

Joe Powers testified, for the State, in rebuttal, that he lived
in the Hope church neighborhood, and was over the road near
which the dead body of the steer was claimed in the defense of
Joe Wyers to have been skinned, but never went as far as Cris-
well's house. He never saw a dead steer on that road as far as
he traveled it in the fall of 1885. He had an old cow to get
down on that road in 1885, and was told that she died. He
never saw her body. Witness, after the conviction of Wyers,
went to the two piles of bones on that road, which he described
as R. A. Reed described them. George Wyers, a brother of Joe
Wyers, was at one of the piles when witness got there. Wit-
ness's brother, Sam Powers, was with witness.

Sam Powers testified, for the State, in rebuttal, substantially
as did his brother Joe, and, in addition, that he knew his
brother's old black cow died in 1885, near the road between Hope
church and Criswell's house, and about the place where the
larger pile of bones was found after the conviction of Joe
Weyers.

The motion for new trial raised the questions discussed in the
opinion.

*J. A. Wharton, J. W. Gamison* and *Oltorf & Harlan,* for the
appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   In this case the assistant attorney general confesses errors, and the errors are manifest upon the record, and of a character which necessitates a reversal of the judgment.

Appellant has been convicted of perjury committed by him as a witness upon the trial of one Joe Wyers, who was on trial for theft of a steer.   Several of the errors complained of relate to the admission of evidence over the defendant's objection.   Several witnesses were permitted to testify to conversations among themselves, and with one Morris, with regard to Morris's suspicions as to Wyers; and further as to an agreement entered into between said witnesses and Morris as to what should be done by the latter in order to detect Wyers in the theft of cattle, in which business the latter was supposed, by said parties, to be engaged. At these conversations, neither Wyers nor this appellant were present.

Such testimony was clearly hearsay, and the conversations and agreements were *res inter alios acta*, and in no manner binding either upon Wyers or this defendant.   (Cohea v. The State, 11 Texas, Ct. App., 153; Tyler v. State, Id., 388; Chumley v. State, 20 Id., 547; Kennedy v. State, 19 Id., 618; Hart v. State, 15 Id., 202; Burke v. State, Id., 156.)

Again, the witness Morris was permitted to testify that after he, witness, had testified on the examining trial of Wyers, "I went away to Tyler county because I had been threatened.   I had, at the time I was threatened, testified fully on the examining trial of Joe Wyers, and serious threats had been made against me before I went off."   Defendant's objections were that the evidence as to the threats was hearsay, and that the defendant was in no way connected with the threats, nor with witness's fleeing the country, if he did so, on account of them.   These objections should have been sustained, because it was not shown or attempted to be shown, that the defendant made the threats or had any connection with them, and the testimony was of a most prejudicial character to his interests.   (20 Texas Ct. App., 157.)

Again, on this trial the entire record of the proceedings on the trial of Joe Wyers for theft was read in evidence by the prosecution.   It was not error to admit this evidence, such testimony being admissible in perjury as inducement, though not to prove perjury.   The general rule is "that whenever extraneous matter is admitted in evidence for a specific purpose, incidental to, but

which is not admissible directly to prove the main issue, and which might tend, if not explained, to exercise a strong, undue or improper influence upon the jury as to the main issue, injurious and prejudicial to the right of a party, then it becomes the imperative duty of the court, in its charge, to so limit and restrict it as that such unwarranted results can not ensue; and a failure to do so will be radical and reversible error, even though the charge be not excepted to." (Davidson v. The State, 22 Texas Ct. App., 373; Taylor v. The State, Id., 530; Washington v. The State, ante p. 336.) No such explanation and limit to this evidence was given the jury in the charge of the court.

Other errors are elaborately and ably discussed in the brief of counsel for appellant, but the above are the most material, and on their account the judgment is reversed and the cause remanded.

*Reversed and remanded.*